UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| MICHAEL and JANE SEIWERT, individually, and AS THEIR NEXT FRIENDS to S.S., K.S., <br><br> Plaintiffs, <br><br> v. <br><br> SPENCER-OWEN COMMUNITY SCHOOL CORPORATION and MARK DECKARD, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) )    2:05-cv-282-WGH-LJM |

**ENTRY ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**I.      Introduction**

This matter is before the Honorable William G. Hussmann, Jr., United States

Magistrate Judge, on Defendant Spencer-Owen Community School Corporation's

Motion for Summary Judgment filed March 1, 2007.  (Docket Nos. 42-43).[1]  Plaintiffs

filed a Response on April 19, 2007.  (Docket No. 49).[2]  Defendant filed its Reply on

May 3, 2007.  (Docket No. 55).

---

[1]The parties consented to Magistrate Judge jurisdiction in this case in their
Case Management Plan filed April 25, 2006.  (Docket No. 21).  District Judge Larry J.
McKinney entered an Order of Reference on May 1, 2006.  (Docket No. 22).

[2]Also before the Court is Defendant's Motion to Strike Response in Opposition to
Motion filed May 3, 2007.  (Docket No. 54).  Having examined Defendant's motion, the
Court concludes that Plaintiffs' Response was filed two days late.  While the Court
finds timeliness to be an important virtue, Defendant has not demonstrated that it
was somehow greatly prejudiced by Plaintiffs' two-day delay.  Defendant's Motion to
Strike Response in Opposition to Motion is **DENIED.**

**II.      Factual and Procedural Background**

The facts, as viewed in the light most favorable to Plaintiffs, are as follows.

Defendant Spencer-Owen Community School Corporation ("School Corporation") is a public school corporation, and thus a governmental entity or political subdivision for purposes of the Indiana Tort Claim Act.  (*See* Affidavit of Marsha Turner-Shear ("Turner-Shear Aff.") ¶ 3).  During the 2003-2004 school year, Defendant Mark Deckard ("Deckard") was an independent contractor with the School Corporation who provided a school bus and operated the bus for the School Corporation.  (*Id.* ¶ 4).

This suit is the culmination of two school years of bullying and Defendants' perceived lack of response to the bullying.  S.S. began being bullied at Owen Valley Middle School ("OVMS") about two months into the 2002-2003 school year. (Deposition of S.S. ("S.S. Dep.") at 8).  S.S. informed his principal of threats that were being made against him, and the principal's response was "don't take all threats seriously."  (*Id.* at 9).  Again in October or November of 2002, S.S. and his parents attended a parent-teacher conference where S.S.'s principal was warned that bullying behavior was occurring.  (*Id.* at 11).  S.S.'s parents again informed the administration and staff at OVMS and the School Corporation administration and school board of the bullying in December 2002.  (Seiwert letter to OVMS staff dated December 9, 2002; email from Jane Seiwert to school board members dated December 2, 2002, 1:21:32 GMT).

Eventually, in 2003, the parents of S.S. and K.S. became involved in a School Corporation effort to address school bullying by developing anti-bullying pledges for

parents, faculty and students, and by helping to develop a disciplinary grid to deal with repeated incidents of bullying by students.  (Email from Terry McDaniel, Superintendent of Spencer-Owen Community School Corp., to Jane Seiwert dated January 3, 2003, 4:02 P.M.); Anti-Bullying Pledges; Deposition of Michael Seiwert ("Seiwert Dep.") at 27-28).  Despite these efforts, S.S. continued to be bullied by his fellow classmates, and in November and December 2003, the bullying of S.S. included him being called "gay" and "faggot."  (Signed handwritten notes of Amy Elkins; *see also* Plaintiffs' Answers to Interrogs.).[3]  S.S. was constantly being verbally abused during the 2003 Fall semester with derogatory language including those two homosexual epithets.  (Plaintiffs' Answer to Interrog. 19).

On another occasion, S.S. was in gym class where he was playing dodge ball. He lost his balance, fell to the ground, and several students began kicking him. (S.S. Dep. at 11-12).  There is no evidence that S.S.'s gym teacher, Mr. Heck, took any action as a result of this assault.  (*Id.*)

Three times within November and December 2003, Jane Seiwert went to speak with OVMS assistant principal Amy Elkins ("Elkins") regarding the problems S.S. had been having with several boy students and their girlfriends, T.R. and P.C. Instead of dealing with the children causing the problems, Elkins apparently felt it would be easier to simply remove S.S. from the classroom and put him in another class rather than choosing to discipline those who harassed S.S.  (Plaintiffs' Answer

---

[3]During the 2003-2004 school year, S.S. was an eighth grade student. (Complaint ¶ 8).

to Interrog. 19).  Elkins rationalized that the teasing would only get worse if she tried to discipline the students.  She thought this would be the easier way to deal with the problem.  (*Id.*)

The School Corporation had been informed and warned that S.S. was being bullied and that the nature of some of the harassment was gender or sexual orientation based, and its only response was to move S.S. to a different classroom and make arrangements with Deckard that one of the students bullying S.S. would be required to sit in the front of the bus so as not to be in close proximity to S.S. (Appendix to Plaintiffs' Response to Defendant's Motion for Summary Judgment at 37-38; *see also* Plaintiffs' Answers to Interrogs.).  The incident that gave rise to the special bus seating assignment and the movement of S.S. to a different classroom involved S.S. and T.R.  S.S. and T.R. were seated next to each other in a reading class in the first semester of the 2003-2004 school year.  (S.S. Dep. at 38).  During the course of that class in early December 2003, T.R. asked S.S. for his homework assignment so that she could copy it.  When S.S. refused to give T.R. his completed homework, T.R. became angry and advised him that she would have her boyfriend either beat him up or kill him.  (*Id.*)  S.S., himself, was not aware of whether T.R. actually even had a boyfriend.  (*Id.* at 40).  However, Plaintiffs allege that T.R. was a "girlfriend" of one of the other boys who had been harassing S.S. during that semester.  (Plaintiffs' Answer to Interrog. 19).

The incident in the classroom between S.S. and T.R. did not cause a classroom disruption; the teacher was unaware of the occurrence.  (Affidavit of Amy

Elkins ("Elkins Aff.") ¶ 2).  The incident was brought to the attention of assistant principal Elkins by S.S.'s parents when they came into the school and advised that S.S. was being taken home due to an anxiety attack.  (*Id.* ¶ 3).  Elkins had a guidance counselor speak with T.R. regarding the incident.  T.R.'s version of the incident directly conflicted with S.S.'s version of the incident.  (*Id.* ¶ 4).

On or about December 4 or 5, 2003, S.S's parents advised school officials that they were taking S.S. out of school for the remainder of the semester due to medical reasons and subsequently provided a letter from Chad Schultheis, M.D., indicating that S.S.'s removal was "medically appropriate."  S.S.'s parents requested that upon his return to school that he have no classes with T.R.  The school agreed and complied with the request.  (Elkins Aff. ¶¶ 5-6).

However, at some point when S.S. was on leave from school, another student, J.B., delivered a message to K.S.[4] from T.R. that when S.S. returned to school, she and/or her boyfriend were going to kill S.S.  (Plaintiffs' Answer to Interrog. 19).  K.S. came home from school crying because she had been warned that her brother's life was in danger when he returned to school.  (*Id.*)  As a result, K.S. informed her parents that S.S. could not return to school.  The Seiwerts spoke with J.B.'s father, and he assured them that he would speak with J.B.  Additionally, this death threat was relayed to Elkins, who said she would follow up the next day; there was no notification of any disciplinary action rendered by the school.[5]  (*Id.*)

---

[4]K.S. is S.S.'s older sister. (Complaint ¶¶ 5, 11).

[5]In addition to the alleged death threat, another student, S.M., started a rumor that S.S. was out of school because he had acquired the AIDS virus.  (Plaintiffs' Answer to Interrog. 19).

Plaintiffs, on two occasions when S.S. was being harassed, informed Deckard that T.R. had been picking on K.S. and had issued a death threat to S.S.  Deckard spoke with Tie Mungle ("Mungle") about these issues, and the two of them decided to rearrange the bus seating putting K.S. and S.S. in the back of the bus and T.R. in the front just behind the bus driver.  (Plaintiffs' Answer to Interrog. 19).  Deckard made a negative comment about T.R. and positive comments about S.S. and K.S. (*Id.*)

S.S. eventually returned to OVMS in January 2004 at the end of the winter recess.  On Friday, January 9, 2004, on the school bus on the way home, T.R. came up to K.S. and advised her that she was going to "pick on" or "beat up" K.S.'s brother, S.S.  (Deposition of K.S. ("K.S. Dep.") at 5, 22).  As K.S. was exiting the bus on that Friday, she advised Deckard that T.R. was "bothering" her and requested that the bus driver advise T.R. to "back off or to keep her comments to herself."  (*Id.* at 47).  When K.S. arrived home on that Friday, she advised her father of the conversation with T.R., and K.S. and her father then drove to T.R.'s home to speak with T.R.'s mother in reference to keeping the children apart.  (K.S. Dep. at 5).

On January 12, 2004, the very next school day, K.S. and S.S. were picked up by the bus, prior to T.R.  (*Id.* at 25).  When T.R. got on the school bus, initially there was no conversation between her and K.S. and S.S.  (*Id.* at 27).  When the bus arrived at the elementary school, the elementary students would exit the bus.  The other middle school and high school students would then move forward in the bus. (*Id.* at 29).  While at the elementary school, T.R. turned around in her seat on the bus and asked K.S. why K.S. and her father had come to her home on the Friday

before and spoke to her mother.  (K.S. Dep. at 28).  K.S. then told T.R. to turn around and sit down.  (*Id.*)  When K.S. failed to engage in an argument with T.R., T.R. turned her attention to S.S., swearing and yelling at S.S.  (Plaintiffs' Answer to Interrog. 19).  At that point, S.S. approached T.R. and stated "[s]ome people are alive just because it is illegal to kill."  (S.S. Dep. at 19; K.S. Dep. at 28-29).  Plaintiffs claim that T.R. then threw the first punch, striking K.S.  (K.S. Dep. 28; S.S. Dep. at 19).  Once T.R. struck K.S., S.S. then either hit, pushed or tackled T.R., knocking her up against the school bus window.  (S.S. Dep. at 19; K.S. Dep. 8-9).  During the altercation between S.S. and T.R., K.S. was struck again in the face.  (K.S. Dep. at 9; S.S. Dep. at 19).  Deckard never physically intervened to stop the altercation; he only looked in his rearview mirror and ordered the students to stop.  (S.S. Dep. at 35-36).

K.S. has acknowledged that the other students on the bus gave statements that S.S. had struck T.R. first.  (K.S. Dep. at 10).  S.S. acknowledged that the Owen County Prosecutor filed charges against him in juvenile court related to the incident.  (S.S. Dep. at 16).  S.S. was removed by his parents from the Spencer-Owen Community School Corporation's school system and placed in a private school.  (*Id.* at 25).  K.S. remained within the Spencer-Owen Community School Corporation's school system and had no more run-ins or problems with T.R. after the incident on January 12, 2004.  (K.S. Dep. at 18-20).  The School Corporation, as a result of the altercation on the school bus on January 12, 2004, gave both S.S. and T.R. in-school suspensions.  (Turner-Shear Aff. ¶ 6).

Plaintiffs contend that, had the school properly followed its disciplinary grid, T.R. should have been expelled from school well before the school bus incident at issue in this suit.  (Plaintiffs' Answer to Interrog. 20).  Plaintiffs also contend that T.R. was improperly supervised and that Defendants failed to enforce her seating arrangement away from S.S. and K.S.  (Plaintiffs' Answer to Interrog. 19).  Plaintiffs also allege that no appropriate action was taken as a result of the incident on January 12, 2004.  (Complaint ¶ 14).

Plaintiffs filed their Complaint on December 7, 2005.  In the Complaint, Plaintiffs allege violations of the equal protection clause and due process clause of the Fourteenth Amendment, 42 U.S.C. § 1983, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), for Defendants' failure to halt the bullying and failure to come to a proper resolution regarding the January 12, 2004 incident.  Plaintiffs allege that Defendants' failures amount to discrimination based on sexual orientation, whether real or perceived.  Plaintiffs also allege a hostile school environment based on sexual orientation in violation of Title IX.  Plaintiffs additionally raised claims of breach of contract, negligent entrustment, negligent supervision and respondeat superior liability based on the failure of Defendants to intervene during the January 12, 2004 incident or stop it from occurring altogether.  Finally, Plaintiffs allege that Defendants' actions amounted to either intentional or negligent infliction of emotional distress.

Defendant School Corporation seeks summary judgment on all of Plaintiffs' claims.  Specifically, the School Corporation argues that Plaintiffs' due process claim is encompassed by their equal protection claim and must be dismissed.  The School

Corporation also argues that Plaintiffs' equal protection claim must be dismissed because the School Corporation did not engage in discrimination based on sexual orientation.  Defendant argues next that Plaintiffs' Title IX claim must be dismissed because the parents have no cause of action, because the incident with T.R. did not amount to harassment based on sexual orientation, because none of the actions were severe or pervasive enough to be actionable, and because the School Corporation acted reasonably.  Additionally, Defendant School Corporation alleges that Plaintiffs' state claims must be dismissed by arguing that there was no breach of contract because the School Corporation owed no duty to ensure S.S. and K.S.'s safety under these circumstances and because any duty was not breached; that there was no negligent entrustment because the School Corporation lacked the requisite actual knowledge to give rise to a cause of action; that there was no negligent supervision or respondeat superior claims because Deckard was an independent contractor; that Plaintiffs' intentional infliction of emotional distress claim must be dismissed because the actions of the School Corporation were not severe enough to give rise to a cause of action; and, finally, that Plaintiffs' negligent infliction of emotional distress claim must fail because S.S. suffered no "impact" and because nothing the School Corporation did was the proximate cause of Plaintiffs' injury.

### III.    Legal Standard

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The motion should be granted so long as no rational fact finder could return a verdict in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict, as the question essentially for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. When ruling on the motion, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in that party's favor. *Id.* at 255. If the nonmoving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *see also Silk v. City of Chicago,* 194 F.3d 788, 798 (7th Cir. 1999). Lastly, the moving party need not positively disprove the nonmovant's case; rather, it may prevail by establishing the lack of evidentiary support for that case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV.   Analysis

Plaintiffs brought their claims alleging that Defendants' actions: (a) violated the due process clause and equal protection clause of the Fourteenth Amendment to the U.S. Constitution as prohibited by 42 U.S.C. § 1983; (b) violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a); (c) amounted to a breach of

contract under Indiana law; (d) amounted to negligent entrustment under Indiana law; (e) amounted to negligent supervision under Indiana law; (f) amounted to intentional infliction of emotional distress under Indiana law; and (g) amounted to negligent infliction of emotional distress under Indiana law.

**(a)      Plaintiffs' Equal Protection Claim**

Plaintiffs argue that Defendants' actions violated the equal protection clause of the Fourteenth Amendment to the U.S. Constitution.[6]  An individual seeking to bring an equal protection claim against a state entity such as OVMS may do so via 42 U.S.C. § 1983.  *Nabozny v. Podlesny,* 92 F.3d 446, 453 (7th Cir. 1996).  In order to demonstrate an equal protection violation, Plaintiffs must show that Defendants "acted with a nefarious discriminatory purpose" and discriminated against S.S. or K.S. based on membership in a definable class.  *Id.*  Plaintiffs must, therefore, demonstrate that Defendants acted either intentionally or with deliberate indifference to Plaintiffs' complaints of harassment.  *Id.* at 454.  It is also important to note that the equal protection clause does, in fact, prohibit discrimination based on sexual orientation. *Id.* at 456-57.  This protection is not the type of heightened protection enjoyed by victims of race-based discrimination; rather, a victim of discrimination based on sexual orientation must show that the discriminatory intent

---

[6]Plaintiffs' Complaint also alleges a due process violation pursuant to the Fourteenth Amendment.  However, the parties recognized and the Court agrees that a due process claim is encompassed by and included within an equal protection claim. *Eby-Brown Co., LLC v. Wisconsin Dept. of Agriculture,* 295 F.3d 749, 754 (7th Cir. 2002).

was not rationally related to a legitimate state interest.  *Schroeder v. Hamilton School Dist.,* 282 F.3d 946, 950-51 (7th Cir. 2002).

In this instance, Defendant School Corporation alleges that summary judgment is warranted because:  (1) Plaintiffs have not provided adequate evidence that S.S. was harassed on account of his membership in a protected class; and (2) Plaintiffs' equal protection claim must fail because Plaintiffs have not demonstrated the requisite intent for them to be held liable.  With regard to the School Corporation's initial argument, the Court notes that there was evidence that S.S. was harassed because of his perceived membership in a protected class.  The evidence in the light most favorable to Plaintiffs suggests that S.S. went through an at least two-month period of harassment in November and December 2003 that included harassment calling into question S.S.'s sexual orientation.  Plaintiffs also allege that T.R.'s behavior, including death threats that lead to S.S.'s temporary removal from school and a fight that led to his permanent removal from school, was connected to the behavior of other boys who had been harassing S.S. during the same time frame as the anti-homosexual bullying.  A reasonable inference can also be made that S.S. was assaulted during the Winter 2003 dodge ball game for the same reasons that he was being harassed by being called derogatory names.  As was the case in *Nabozny*, people do not always exclaim, "I'm assaulting you because you are gay," or "I'm threatening you because you are gay."  Once it has been established that an individual has been repeatedly harassed because of a perceived homosexual

orientation, it is up to the jury to determine if all of the harassment is connected or if some of it is associated with some other nondiscriminatory intent.[7]

Because Plaintiffs have demonstrated harassment based on sexual orientation, we must proceed to examine if OVMS was at least deliberately indifferent to Plaintiffs' complaints. The Seventh Circuit has recognized that when a school has a policy or practice of punishing perpetrators of battery or harassment, "departures from [these] established practices may evince discriminatory intent." *Nabozny,* 92 F.3d at 455.

Here, there is evidence that OVMS failed to adhere to its policies concerning harassment in examining the two death threats against S.S. and in failing to examine the anti-homosexual harassment at the hands of students during the Fall/Winter of 2003. In fact, Plaintiffs allege that OVMS knew of the second death threat against S.S. that was conveyed to K.S. and chose to do nothing. Plaintiffs also allege that had OVMS simply adhered to its disciplinary procedures, T.R. would have been suspended or expelled from school or prohibited from riding the bus before the final incident on the school bus ever took place. This leads the Court to conclude that there is a significant factual dispute concerning whether OVMS departed from its established practices in dealing with S.S. and that summary

---

[7]While the Seventh Circuit noted in *Schroeder* that discrimination based on sexual orientation is permissible so long as there is a rational basis for such action, Defendant School Corporation does not argue that there was some rational basis for allowing S.S. to be harassed because of perceived homosexuality. Because the Court cannot conceive of any circumstance in which there would be a rational basis for permitting such harassment, it is unlikely that this element could be an issue at trial.

judgment on Plaintiffs' equal protection claim is not warranted.  Defendant's Motion

for Summary Judgment on Plaintiffs' equal protection claim is **DENIED.**

**(b)    Plaintiffs' Title IX Claim**

Plaintiffs' next argue that Defendants' actions were sex-based discrimination

in violation of Title IX.  Title IX of the Education Amendments of 1972 provides that

"[n]o person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance."  20 U.S.C.

§ 1681.  Under Title IX, a recipient of Federal funds, such as OVMS, may be liable

only for damages suffered as a result of its own misconduct.  *Davis, as Next Friend of*

*LaShonda D. v. Monroe County Bd. of Educ.,* 526 U.S. 629, 640, 119 S.Ct. 1661,

1670, 143 L.Ed.2d 839 (1999).  The rule that the Supreme Court adopted in *Davis* is

that a school may be liable if the school is "deliberately indifferent to sexual

harassment, of which they have actual knowledge, that is so severe, pervasive, and

objectively offensive that it can be said to deprive the victims of access to the

educational opportunities or benefits provided by the school."  *Id.* at 650.

The first portion of the Court's analysis, therefore, involves determining

whether or not S.S. suffered from harassment that is so severe, pervasive, and

objectively offensive that it deprived him of an educational opportunity or benefit.

*Gabrielle M. v. Park Forest-Chicago Heights, Illinois School Dist.,* 315 F.3d 817, 822

(7th Cir. 2003).  In this instance, the facts viewed in the light most favorable to

Plaintiffs indicate that S.S. was called names for two separate school years

repeatedly being called "gay" and "faggot," that he was kicked by several boys after he fell to the ground during a dodge ball game, that he endured death threats, and that his treatment lead to him being removed from school in December of 2003 due to psychological concerns and eventually removed from school permanently.  These incidents, if true, certainly amount to severe and pervasive conduct that was objectively offensive.  Being called outrageous names, physically assaulted, and having one's life threatened is severe and pervasive behavior.  The conduct may have been so severe that it actually caused S.S. to no longer be able to attend OVMS.

The question remains, however, whether this harassment amounted to sexual harassment prohibited by Title IX.  There is no concrete evidence that any of the children at OVMS was harassing S.S. simply because he was a male.  S.S. may, however, still have a viable Title IX claim.  As the Seventh Circuit has clearly indicated, "federal courts look to cases decided under Title VII to inform analysis under Title IX." *Doe v. University of Illinois,* 138 F.3d 653, 663 (7th Cir. 1998).  And, within the context of Title VII, the Seventh Circuit has intimated that there is a second avenue for demonstrating sexual harassment.  If an individual is being harassed because of a failure to adhere to specific sexual stereotypes, and not because of his sexual orientation, he has an actionable claim.  *Hamm v. Weysuwega Milk Products, Inc.,* 332 F.3d 1058, 1065 n.5 (7th Cir. 2003); *Massaro v. Illinois Dept. of Corrections,* 2006 WL 1063797 at *5 (C.D. Ill. 2006).  Thus, it is conceivable that an individual could sustain a cause of action under Title IX if he were to demonstrate that he was being harassed – not because he was a homosexual, but

because he was acting in a manner that did not adhere to the traditional male stereotypes.

In S.S.'s case, it is reasonable to infer from the facts that the students of OVMS were engaged in a campaign of harassment against S.S. because his actions lead some of the boys at OVMS and their girlfriends to conclude that S.S. was homosexual. There is no other proffered reason why the students at OVMS were harassing S.S.[8] Because the Court's duty at the summary judgment stage is to examine the facts in the light most favorable to Plaintiffs, drawing all reasonable inferences from those facts in Plaintiffs' favor, we conclude that Plaintiffs have demonstrated the type of harassment prohibited by Title IX.

Having found that S.S. suffered severe, pervasive, and objectively offensive sexual harassment, the Court must still examine whether or not Defendant School Corporation had actual knowledge of these incidents. *Gabrielle M.*, 315 F.3d at 823. Here, the record demonstrates that the School Corporation was warned in October or November of 2002 when S.S. and his parents attended a parent-teacher conference and informed the OVMS principal that bullying was taking place. And, Plaintiffs allege that Jane Seiwert went to OVMS assistant principal Elkins on three occasions in November and December 2003 and warned her of the harassment that was occurring. Finally, OVMS officials were made aware of the threats issued by

---

[8]To be certain, there is a fine line between being harassed because of one's sexual orientation and being harassed because of a failure to adhere to traditional male stereotypes. It might very well be the case that Plaintiffs are unable to sustain causes of action under both the equal protection clause (for being harassed because of sexual orientation) and Title IX (for being harassed because of failure to adhere to traditional male stereotypes). That, however, will be a distinction that the jury must make at trial.

T.R.  Hence, it is clear from the record that the School Corporation had actual knowledge of the harassment.

Even if an individual demonstrates that he was the victim of the type of sexual harassment or discrimination prohibited by Title IX and that a school had actual knowledge of these incidents, the school can still escape liability.  Defendants are only liable under Title IX if they acted with deliberate indifference to Plaintiffs' complaints; this means that the School Corporation is liable if its actions were "clearly unreasonable." *Gabrielle M.*, 315 F.3d at 824.  Here, the School Corporation chose not to discipline an individual who issued what could be construed as at least two death threats to S.S.  They also informed S.S. on at least one occasion that some threats aren't as serious as others.  When the School Corporation did take action in one instance, their decision was to move S.S. to a different classroom rather than deal with the other student's threats and actions.  Finally, after T.R. took her threats beyond mere words and instigated an altercation, the School Corporation apparently still decided to discipline both S.S. and T.R. equally, prompting S.S.'s parents to decide that he was no longer safe at OVMS and that he must finally be removed from OVMS and placed in another school.  A jury could conclude that these actions were clearly unreasonable.[9]  In fact, the students at OVMS who were bullying S.S. could

_____

[9]In *Davis,* the Supreme Court states "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law."  *Davis,* 526 U.S. at 649.  The Magistrate Judge believes that in this case, because of the number of incidents involved over a protracted time involving S.S., the directed verdict stage of the litigation will provide a more informed and accurate factual basis to address this issue.  The parties should be prepared to revisit the "unreasonableness" of the School Corporation's response at that stage of the litigation.

have actually construed the School Corporation's inaction as tacit approval of their behavior, prompting them to engage in even greater acts of bullying.

Having found that Plaintiffs have satisfied all of the elements of a Title IX claim, Defendant's Motion for Summary Judgment must be **DENIED.**

While Plaintiffs' Title IX cause of action on behalf of S.S. survives summary judgment, any causes of action on behalf of the parents individually or K.S. must be dismissed.  First, while the Seventh Circuit has never addressed the issue, it is apparent from the language of Title IX that a parent lacks standing to bring a cause of action in their individual capacity based on Title IX.  Title IX only protects against actions that interfere with educational opportunities or activities.  Because there are no educational opportunities or activities that the parents are excluded from, they have no claim.  At least one other circuit agrees.  *Rowinsky v. Bryan Independent School Dist.,* 80 F.3d 1006, 1010 n.4 (5th Cir. 1996).  Second, K.S. has not asserted any facts to suggest that she was either excluded from an educational activity or opportunity or that any harassment against her was on account of her sex; she was simply an innocent bystander to the abuse that S.S. endured.

(c)      **Breach of Contract**

Defendant School Corporation also argues that it is entitled to summary judgment on Plaintiffs' breach of contract claim.  The School Corporation alleges that S.S. and K.S. were not intended beneficiaries of the contract, that there was no duty owed to S.S. and K.S., and that the School Corporation was not the cause of any damages sustained by S.S. or K.S.

As the Indiana Court of Appeals has noted, in order "to enforce a contract by virtue of being a third-party beneficiary, the third-party beneficiary must show:  (1) A clear intent by the actual parties to the contract to benefit the third party; (2) A duty imposed on one of the contracting parties in favor of the third party; and (3) Performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract." *Luhnow v. Horn,* 760 N.E.2d 621, 628 (Ind.Ct.App. 2001).

There can be no doubt that any contract between a school bus and a school to transport students from their home to the school clearly contains within it an intent to benefit the students being transported.  Additionally, such a contract also would impose a duty to use due care in transporting the students, and the only way that the student would obtain a direct benefit would be by performance (transporting the students).  Thus, the three elements necessary for S.S. and K.S. to obtain third-party beneficiary status are each present.

Defendant School Corporation argues that it owed no duty to S.S. and K.S.  It is true that "schools are not intended to be the insurers of the safety of their pupils . . . ." *Miller v. Griesel,* 308 N.E.2d 701, 706 (Ind. 1974).  Yet, a school generally has a duty to use ordinary and reasonable care for the safety of their students; that is, a school must use the level of care that an ordinary prudent person would use under the circumstances.  *Id.*  Whether a party's actions conformed to this duty is generally a question of fact.  *Jones v. Indiana Bell Telephone Co.,* 864 N.E.2d 1125, 1127 (Ind.Ct.App. 2007).  In light of Plaintiffs' allegation that they informed OVMS of the first death threat against S.S. which led to his temporary removal from school,

and the allegation that they informed OVMS of the second death threat against S.S. which was conveyed to K.S., a jury could conclude that a reasonable and prudent individual would have, under no circumstances, permitted T.R. on the same bus as S.S.  Therefore, at least some minimal duty was owed to S.S. and K.S., and a question remains whether the School Corporation breached that duty.  At trial, that will be for a jury to decide.

Finally, Defendant School Corporation argues that it cannot be liable as it was not the cause of S.S. and K.S.'s injuries.  However, but for the School Corporation's decision to allow T.R. on a school bus with S.S. after T.R. had arguably issued two death threats against him, the incident on the school bus would have never happened.  Furthermore, as Indiana courts have noted, whether a particular event is a proximate cause of someone's injuries is generally a question of fact reserved for determination by the jury at trial.  *Stumpf v. Hagerman Const. Corp.,* 863 N.E.2d 871, 879 (Ind.Ct.App. 2007).

Because there was at least some duty owed to S.S. and T.S., and because breach and causation are generally questions of fact left to the jury, Defendant's Motion for Summary Judgment on Plaintiffs' breach of contract claim is **DENIED.**

### (d)     Negligent Entrustment

Defendant School Corporation also moved for summary judgment on Plaintiffs' negligent entrustment claim.  Under Indiana law, Plaintiffs, in order to prevail on their negligent entrustment claim, must establish the following elements:  (1) an entrustment; (2) to an incapacitated individual or someone incapable of using due care; (3) with actual and specific knowledge, at the time of the entrustment, that the

individual was incapacitated or unable to use due care; (4) proximate cause; and (5) damages. *Hardsaw v. Courtney,* 665 N.E.2d 603, 606 (Ind.Ct.App. 1996).

Plaintiffs argue in their Complaint that OVMS knew or should have known that bullying by T.R. could occur on the bus, but allowed Deckard to drive the bus with T.R. on it despite this knowledge, and that they therefore negligently entrusted Deckard with the school bus.  (Complaint ¶ 20).  Plaintiffs have turned the theory of negligent entrustment on its head.  They have twisted the second element of negligent entrustment to fit their fact pattern.  Yet, negligent entrustment requires entrusting a knowingly incapacitated individual despite knowledge of his incapacitation.  Here it was T.R., not Deckard, that Plaintiffs allege was dangerous. Therefore, they have failed to demonstrate the existence of the second element necessary for a negligent entrustment claim.  Defendant's Motion for Summary Judgment on Plaintiffs' negligent entrustment claim is **GRANTED.**

### (e)    Negligent Supervision

Defendant School Corporation argues that Plaintiffs' negligent supervision claim must also fail because Deckard is an independent contractor.  The School Corporation's argument misses the mark.  It is true that a principal who delegates a duty to an independent contractor generally is not liable for the negligence of that independent contractor.  However, that is not the case where the principal is by law or by contract charged with performing the specific duty.  *Shand Min., Inc. v. Clay County Bd. of Com'rs.,* 671 N.E.2d 477, 481 (Ind.Ct.App. 1996).  In this instance, at the time of the incident at issue in this suit, Indiana Code 20-9.1 *et seq.* placed transportation of school children within the hands of the School Corporation.  The

Court concludes that, by drafting a statute that placed the authority with the School Corporation to transport school children, the Indiana legislature must have intended for transportation to be a non-delegable duty "so important to the community that the principal should not be permitted to transfer these duties to another." *Id.*[10] Therefore, whether Deckard's status is that of an independent contractor is irrelevant to the Court's analysis under these circumstances, because even if he is an independent contractor, the school may still be liable.  Defendant's Motion for Summary Judgment on Plaintiffs' negligent supervision claim is **DENIED.**

**(f)     Intentional Infliction of Emotional Distress**

Defendant further moved for summary judgment on Plaintiffs' intentional infliction of emotional distress ("IIED") claim.  As has been explained by the Indiana Supreme Court, "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such [intentional infliction of] emotional distress . . . ." *Cullison v. Medley,* 570 N.E.2d 27, 31 (Ind. 1991).  Indiana courts have adopted Section 46 of the Restatement (Second) of Torts, *Lachenman v. Stice,* 838 N.E.2d 451, 456-57 (Ind.Ct.App. 2006), and *Bradley v. Hall,* 720 N.E.2d 747, 752-53 (Ind.Ct.App. 1999), which describes the stringent requirements to prove IIED as follows:

> The cases thus far decided have found liability only where the
> defendant's conduct has been extreme and outrageous.  *It has not*

---

[10]This seems to be the only logical conclusion, as the School Corporation would, for example, certainly have obligations to communicate with a school bus driver in the event that a dangerous student who had been expelled was no longer permitted on the bus or that an epileptic student would be riding the bus and the bus driver would need special training in the event that a seizure occurred.

> *been enough that the defendant has acted with an intent which is*
> *tortious or even criminal, or that he has intended to inflict*
> *emotional distress*, or even that his conduct has been
> characterized by 'malice,' or a degree of aggravation which
> would entitle the plaintiff to punitive damages for another tort.
> Liability has been found only where the conduct has been so
> outrageous in character, and so extreme in degree, as to go
> beyond all possible bounds of decency, and to be regarded as
> atrocious, and utterly intolerable in a civilized community.
> Generally, the case is one in which the recitation of the facts to
> an average member of the community would arouse his
> resentment against the actor, and lead him to exclaim,
> 'Outrageous!'

RESTATEMENT (SECOND) OF TORTS § 46 (emphasis added).  And, IIED occurs only

"where conduct exceeds all bounds usually tolerated by a decent society and causes

mental distress of a very serious kind."  *Lachenman,* 838 N.E.2d at 457.

Here, there has been no evidence presented to support a reasonable inference

that Defendant or its employees intended to inflict emotional distress upon S.S. and

K.S.  Additionally, regardless of how negligent Defendant School Corporation's

actions, if proven, may have been, none of the alleged behavior strikes the Court as

being "atrocious and utterly intolerable in a civilized society."  Defendant's Motion

for Summary Judgment is, therefore, **GRANTED,** and Plaintiffs' IIED claim is

**DISMISSED.**

**(g)     Negligent Infliction of Emotional Distress**

Finally, Defendant School Corporation seeks summary judgment on Plaintiffs'

claim of negligent infliction of emotional distress.  The School Corporation alleges

that this claim must be dismissed because no underlying tort has been proven,

because no injury to S.S. has been shown, and because the School Corporation was

not the cause of any injury to S.S.  All of these arguments are unavailing.

In Indiana, negligent infliction of emotional distress is an independent tort and a plaintiff seeking to recover under a theory of negligent infliction of emotional distress no longer has to prove any underlying physical injury or physical impact in order to prevail. *Indiana Patient's Compensation Fund v. Winkle,* 863 N.E.2d 1, *6 (Ind.Ct.App. 2007). Additionally, as the Court has discussed above, causation is generally a question of fact for the jury to determine. Hence, Defendant's Motion for Summary Judgment on this matter is without merit and must be **DENIED.**

## V.      Conclusion

For the reasons outlined above, Defendant School Corporation's Motion for Summary Judgment is **GRANTED, in part, and DENIED, in part.** Plaintiffs' due process claim and claims of intentional infliction of emotional distress and negligent entrustment must be **DISMISSED**. Plaintiffs' Title IX claims on behalf of K.S. and the parents are also **DISMISSED**. All other claims remain for trial. Defendant's Motion to Strike Plaintiffs' Response to Defendant's Motion for Summary Judgment is **DENIED.**

           **SO ORDERED.**

**Dated:**  July 6, 2007

                                                          WILLIAM G. HUSSMANN, JR.
                                                                Magistrate Judge

**Electronic copies to**:

Mark S. Alderfer
HACKMAN HULETT & CRACRAFT LLP
malderfer@hhclaw.com

- 24 -

Thomas J. Belcher
KELLEY BELCHER & BROWN
tbelcher@kelleybelcherbrown.com

Michael K. Bonnell
mkbonnell@hotmail.com